IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JOSHUA MAXWELL | ) | |
| | ) | Case No.: |
| *Plaintiff,* | ) | |
| | ) | Judge |
| v. | ) | Magistrate Judge |
| | ) | |
| SMYRNA READY MIX CONCRETE, LLC | ) | |
| | ) | |
| | ) | JURY DEMAND |
| *Defendant.* | ) | |

**COMPLAINT**

**INTRODUCTION**

This action arises from Defendant Smyrna Ready Mix Concrete LLC's ("SRM" or "Defendant") discrimination and retaliation against Plaintiff Joshua Maxwell ("Plaintiff") because of his service and obligations as a member of the United States National Guard and its failure to accommodate his disabilities and its discrimination and retaliation against him. Plaintiff started working for Defendant in 2018 until his termination in 2026. He received multiple promotions and ultimately attained the position of General Manager. After learning that Plaintiff would be deployed for military service, Defendant allowed Plaintiff to work closer to home, where Plaintiff was constructively demoted, but still held his General Manager title. Following Plaintiff's return from deployment, Defendant refused to restore him to his General Manager position and ultimately terminated his employment, in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA").

Following his return from deployment, Plaintiff was diagnosed with PTSD, major depressive disorder, insomnia, migraines, and tinnitus. Plaintiff informed Defendant of his

disabilities and need for ongoing medical treatment. Despite knowledge of Plaintiff's conditions, Defendant subjected him to adverse treatment, refused to adequately accommodate his medical needs, and criticized him for conduct related to his disabilities. Defendant ultimately terminated Plaintiff under the pretext of attendance and scheduling concerns.

## PARTIES

1. Plaintiff, Joshua Maxwell ("Mr. Maxwell" or "Plaintiff") is a citizen and resident of Rutherford County, Tennessee, and former employee of Defendant. Plaintiff worked at various locations for Defendant in Kentucky and Tennessee and most recently worked at Defendant's location in Mt. Juliet, Tennessee.

2. Defendant, Smyrna Ready Mix Concrete, LLC ("SRM" or "Defendant"), is a Tennessee Limited Liability Company with its principal place of business located at 1000 Hollingshed Cir, Murfreesboro, TN 37129-4036. Its registered agent for service of process is JD Kious located at 1000 Hollingshed Cir, Murfreesboro, TN 37129-4036.

3. At all material times, Defendant has been an employer as defined by USERRA, 38 U.S.C. §4303(4).

4. At all material times, Plaintiff has been an employee as defined by USERRA, 38 U.S.C. §4303(3).

5. At all material times, Plaintiff is a member of the armed services, specifically the United States National Guard, as defined by 38 U.S.C. §4303(13) and 38 U.S.C. §4303(17).

6. At all material times, Defendant has been an employer as defined by the TDA, Tenn. Code Ann. § 8-50-103(d).

7. At all material times, Plaintiff was an individual with a disability under the TDA/THRA, Tenn. Code Ann. §4-21-102(3)(A).

8. At all material times, Defendant has been an employer as defined by the THRA, Tenn. Code Ann. § 4-21-102(5), and Plaintiff was an employee as defined by the THRA.

**JURISDICTION AND VENUE**

9. This is an action for unlawful employment practices brought under the Uniformed Services Employment and Reemployment Rights Act ("USERRA") 38 U.S.C. (Count I), the Tennessee Disabilities Act ("TDA") (Count II), and the Tennessee Human Rights Act ("THRA") (Count III).[1]

10. This Court has jurisdiction under 38 U.S.C. §4323(b)(3), 28 U.S.C. §1331, and 28 U.S.C. §1367.

11. Venue is proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to these claims occurred in the judicial district.

**FACTS**

12. Mr. Maxwell originally served in the National Guard from 2013 until 2015.

13. On July 16, 2018, Mr. Maxwell began working for Defendant as a Mixer Operator (i.e., Truck Driver).

14. In October of 2018, Mr. Maxwell re-enlisted with the National Guard and informed his then Plant Manager, Eric Bolton, of his military connection and service.

15. Mr. Maxwell is currently a Sargeant with the rank E5 in the National Guard.

16. During his employment, Mr. Maxwell received positive performance reviews, was never disciplined, and received multiple promotions.

[1] Plaintiff' has filed a Charge of Discrimination against SRM. Such Charge is still pending with the EEOC. After exhaustion of Plaintiff's administrative remedies, Plaintiff may file an amended complaint alleging his claims of disability discrimination, failure to accommodate, and retaliation under the Americans with Disabilities Act as amended.

17. On December 6, 2021, Defendant promoted Mr. Maxwell to General Manager over its Western and Central Kentucky divisions.

18. Duties as General Manager included overseeing daily operations of eight concrete plants, including drivers, dispatchers, quality control personnel, sales staff, and safety personnel, as well as conducting safety meetings and overseeing payroll.

19. In August of 2023, Mr. Maxwell informed Defendant's CEO, Jeff Hollingshead, that he received military orders and would deploy in September of 2024.

20. Mr. Hollingshead offered to allow Mr. Maxwell to work in Middle Tennessee three months prior to his deployment so he could be closer to his family before his deployment, and that he would be returned to the General Manager position in Kentucky when he returned from his military leave.

21. Beginning June 28, 2024, Mr. Maxwell started working in the Middle Tennessee location of SRM.

22. Prior to this transfer, Mr. Maxwell served as a General Manager and reported directly to Jeff Hollingshead. After the transfer, he reported to another General Manager, Joe Autry, and was primarily assigned dispatch and operational duties.

23. The organizational structure of SRM is such that dispatcher is approximately three (3) positions below that of general manager. Placement in such position was effectively a demotion in terms and duties of his position.

24. On or around August 5, 2024, Mr. Maxwell reminded Mr. Autry that he also held the position of general manager when Mr. Autry requested that he transport a truck.

25. In response, Mr. Autry berated Mr. Maxwell and, on information and belief, complained to Mr. Hollingshead.

26. Mr. Hollingshead subsequently called Mr. Maxwell and told him he could either drive a truck or take unpaid leave until his deployment leave began and to not "pull the 'GM' card."

27. Mr. Maxwell was then effectively assigned to the position of truck driver for the remainder of the period before his military leave.

28. The position of truck driver is approximately 4 positions below that of General Manager.

29. On August 28, 2024, well before his military leave was to begin, Defendant required Mr. Maxwell to return company property, including his work vehicle and laptop, and disabled his employee access.

30. Mr. Maxwell's last physical day of work before his deployment was August 28, 2024.

31. Mr. Maxwell left for his deployment on September 23, 2024.

32. During his military service, Defendant filled Mr. Maxwell's General Manager position with other employees, including Kenton Holt.

33. Mr. Maxwell returned from deployment on August 9, 2025, and reported back to work on August 25, 2025.

34. Shortly after his return, at a church event, Mr. Hollingshead asked Mr. Maxwell's wife whether Mr. Maxwell was "done with the military now." When she explained that he still had military obligations, Mr. Hollingshead appeared disappointed.

35. When Mr. Maxwell returned to work, Defendant did not restore him to his pre-deployment position as General Manager.

36. Instead, Mr. Hollingshead informed Mr. Maxwell that they were still trying to determine where to place him and required him to report to the Middle Tennessee location in Smyrna for training on Defendant's operating system.

37. Unlike other General Managers, Mr. Maxwell was not provided with a company vehicle, company credit card, gas card, or performance bonus.

38. During this training, he was again placed under Joe Aultry in Smyrna.

39. Mr. Maxwell informed management that he believed federal law required his reinstatement to his former position or an equivalent position.

40. In response, Mr. Hollingshead told Mr. Maxwell that he would never be a general manager again.

41. On or around September 17, 2025, Defendant temporarily assigned Mr. Maxwell to a Plant Manager position rather than restoring him to a General Manager role.

42. Plant manager is a demotion from General Manager.

43. Around that same time, a General Manager position became available. Although Defendant represented that Mr. Maxwell was being considered for the role, Defendant selected another employee, Kenton Holt.

44. In October of 2025, Defendant assigned and demoted Mr. Maxwell to a dispatcher position in White House, Tennessee under the supervision of Tyler Vernon as the General Manager.

45. During this assignment he had to use his mother's extra vehicle to commute to work because he still did not have a company credit card, gas card or company vehicle.

46. In November of 2025, Mr. Maxwell requested a meeting with Mr. Hollingshead to inquire about his future with the company.

47. In that meeting, Mr. Hollingshead made several anti-military statements and revealed his anti-military animus toward Mr. Maxwell, including:

- Your future is dispatch;
- It's not my fault you deployed;
- It wasn't my choice for you to go overseas;
- If you weren't military, I would've fired you already;
- [he] wasn't good enough to be a GM and he would have to prove himself to ever be a GM again; and
- Legally he couldn't take his title or pay, but since he demoted him to dispatching and driving before deployment, that's all they legally had to do.

48. Plaintiff disputed that he was never demoted prior to his military leave and there is no documentary evidence that his position was changed from General Manager.

49. After this meeting where Plaintiff asserted his rights to be returned to his position, Defendant subsequently placed Plaintiff permanently on a dispatcher role in Mt. Juliet reporting to Tyler Vernon.

50. Dispatcher duties include answering the phones and taking orders and is three (3) positions lower than his general manager role before his deployment.

51. In September of 2025, Mr. Maxwell was diagnosed with post-traumatic stress disorder ("PTSD"), major depressive disorder, insomnia, migraines, and tinnitus by the Department of Veteran's Affairs medical department.

52. Mr. Maxwell immediately informed management, Joe Autry and Tyler Vernon, of these conditions, and his need for ongoing medical treatment, including weekly therapy appointments for EMDR, to help with his ongoing medical conditions.

53. Tyler Vernon required Mr. Maxwell to attend medical appointments virtually, which did not allow him to receive EMDR therapy, rather than permitting him to attend in person and otherwise failed to accommodate his disabilities.

54. On or around November 12, 2025, while experiencing migraine symptoms at work, Mr. Maxwell was accused of sleeping by management despite his known medical condition.

55. Specifically, the plant manager, Mr. Daniel Vandergrift, hit the back of his chair and accused him of sleeping.

56. Mr. Maxwell received military orders requiring him to be out for training from February 3 through February 8, 2026, and provided notice to Defendant and everyone at the Mt. Juliet plant through email.

57. On February 11, 2026, after returning from military training, Tyler Vernon complained that Mr. Maxwell was not at work enough and criticized his military-related absences.

58. Tyler Vernon also complained that Mr. Maxwell had not worked sufficient Saturday shifts, even though he was not scheduled for those shifts, and on many of the Saturdays he had military drills for which he was approved to be off.

59. Every dispatcher was required to work one Saturday a month based on a rotation of the four dispatchers in Mt. Juliet and would receive a bonus for the shift.

60. Mr. Maxwell worked several Saturdays however he never received a Saturday bonus for the Saturdays he worked.

61. The criticisms by management were unfounded. Mr. Maxwell worked Saturday January 24, nobody from the company worked Saturday January 31 due to inclement weather in Nashville, and on February 7, Mr. Maxwell was on military orders.

62. On February 11, 2026, shortly after Mr. Maxwell returned from military duty, Tyler Vernon directed him to work on Saturday, February 14, 2026, even though Mr. Maxwell had not previously been scheduled to work that day and his next Saturday shift should have been February 21st.

63. Because he already had personal commitments, Mr. Maxwell arranged for a qualified coworker, Alfredo Hernandez, to cover the shift. Mr. Hernandez agreed to do so.

64. Despite Mr. Maxwell's military obligations, his compliance with the Saturday rotation, and his efforts to ensure coverage for the February 14th shift, management criticized his attendance on February 12, 2026.

65. Management also made comments that Mr. Maxwell "was not the same person he was before deployment."

66. Jason Mitchell, the Mid-South Division President, terminated Mr. Maxwell on February 13, 2026.

67. At the time of his termination, Plaintiff had received positive performance evaluations and no discipline or documentation for any alleged performance deficiencies.

68. Defendant stated that the reason for the termination was Mr. Maxwell's alleged failure to work Saturdays, taking two-hour lunches, and "doing whatever he wanted."

69. Defendant prepared a Separation Notice which listed the reason for Plaintiff's separation as "Position eliminated."

70. Defendant submitted a Position Statement to the Equal Employment Opportunity Commission on June 22, 2026, that stated its reason for termination was "the culmination of numerous performance issues in 2025 and 2026 that resulted in his position being eliminated."

71. Thus, Defendant has provided continuously shifting reasons for Plaintiff's termination.

72. All of Defendant's stated reasons are false and a pretext for discrimination and retaliation.

73. Defendant's actions were motivated by Mr. Maxwell's military service, military obligations, protected leave, disability, regarding him as disabled, and requests for accommodation.

**Count I**
**Violation of USERRA**

74. Plaintiff restates and incorporates herein the above paragraphs in their entirety.

75. USERRA prohibits "discrimination against persons because of their service in the uniformed services." 38 U.S.C. §4301(a)(3).

76. It is federal public policy and law under the Uniformed Services Employment and Reemployment Rights Acts ("USERRA") 38 U.S.C. §4301 that employees must be able to exercise their rights without fear of reprisal or penalty from an employer.

77. Plaintiff has federally protected status as a member of The United States National Guard under 38 U.S.C. §4303(13).

78. Plaintiff was entitled to protected leave to attend his required service for the United States National Guard.

79. Plaintiff gave notice to Defendant of his leave and his intent to return following the completion of his deployment as required by 38 U.S.C. §4303(8).

80. Prior to his deployment, Plaintiff was a General Manager.

81. Upon receiving notice of his intent to take USERRA-protected military leave, Defendant constructively demoted Plaintiff from his General Manager role.

82. Upon Plaintiff's return, Defendant failed to restore Plaintiff to his position of General Manager or to a position of like seniority, status or pay as required by 38 U.S.C. §4313(a).

83. Plaintiff's protected status as a member of the National Guard was a substantial or motivating factor in Defendant's decision to demote Plaintiff and ultimately terminate him from employment.

84. Defendant knowingly and willfully violated USERRA 38 U.S.C. §4311 by retaliating against Plaintiff when he took protected leave by demoting him and ultimately terminating him.

85. As a result, Plaintiff is entitled to recover his damages, including lost wages and benefits compensatory damages, liquidated damages, attorney's fees, cost, interest, reinstatement, front pay and benefits, and any other legal and equitable relief to which he may be entitled.

**Count II**
**Violation of TDA**

86. Plaintiff restates and incorporates herein the foregoing paragraphs in their entirety.

87. Plaintiff was disabled as defined by the TDA/THRA § 4-21-102(3)(A).

88. Plaintiff has a physical or mental impairment that substantially limits one or more of his major life activities.

89. Plaintiff suffers from PTSD, anxiety, chronic and major depressive disorder, tinnitus, and insomnia.

90. These impairments substantially limit several of his major life activities, including, but not limited to, sleeping, concentrating, thinking, working, and communicating.

91. Plaintiff has a record of having such an impairment and/or was regarded as having such impairment by the Defendant.



Case 3:26-cv-01069 Document 1 Filed 07/28/26 Page 11 of 13 PageID #: 11

92. Plaintiff is a qualified individual with a disability, had a record of a disability, and/or was regarded as disabled.

93. Plaintiff was qualified for his position.

94. Plaintiff suffered an adverse employment action when Plaintiff was terminated on February 13, 2026.

95. Defendant discriminated against Plaintiff on the basis of his disabilities in violation of the TDA that culminated in his termination.

96. As a direct and proximate result of Defendant's unlawful acts, Plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and lost earning and benefits.

97. As a result, Plaintiff is entitled to recover his damages, including lost wages and benefits, compensatory and punitive damages, attorneys' fees, costs, interest, reinstatement, front pay and benefits, and any other legal and equitable relief to which he may be entitled.

**Count III**
**THRA Retaliation**

98. Plaintiff restates and incorporates herein the above paragraphs in their entirety.

99. Plaintiff engaged in activity protected by the THRA by notifying his employer of his disability and complaining of discrimination in the workplace.

100. The exercise of his rights was known by Defendant.

101. Shortly after engaging in protected activity, Defendant terminated Plaintiff.

102. There was a causal connection between the protected activity and Plaintiff's termination.

103. As a direct and proximate result of Defendant's unlawful acts, Plaintiff suffered and continues to suffer emotional pain, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, inconvenience and lost earnings and benefits.

104. As a result, Plaintiff is entitled to recover his damages, including lost wages and benefits, compensatory and punitive damages, attorneys' fees, costs, interest, reinstatement, front pay and benefits, and any other legal and equitable relief to which he may be entitled.

**REQUEST FOR RELIEF**

Plaintiff respectfully requests:

1. A jury trial;
2. Back pay and damages for lost benefits, insurance and actual damages;
3. Reinstatement and/or front pay;
4. Compensatory damages for embarrassment, humiliation, stress, anxiety, inconvenience, and loss of enjoyment of life;
5. Liquidated damages;
6. Punitive damages;
7. Attorneys' fees and expenses;
8. Prejudgment interest and, if applicable, post-judgment interest; and
9. Such other and further legal or equitable relief to which he may be entitled under any other statutory or common law.

Respectfully submitted,

*s/ Anne Bennett Hunter*
Anne Bennett Hunter, BPR No. 022407
Hunter Employment Law, PLC
5115 Maryland Way, Suite 125
Brentwood, Tennessee 37027
615.592.2977
anne@hunteremploymentlaw.com

*Attorney for Plaintiff*